UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CA NO. 12-10460-JCB

GARRETT W. LING,
     Plaintiff,

v.

TOWN OF CHATHAM,
CHATHAM POLICE DEPARTMENT,
MARK R. PAWLINA, Chief,
     Defendants.

DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

I.      SUMMARY

      The Plaintiff filed a "Petition for Judicial Review and Complaint pursuant to 42 U.S.C. § 1983" in the Orleans, Massachusetts District Court. The Petition and Complaint sought a review of the defendant, Chief of Police Mark Pawlina's denial of the Plaintiff's application for a permit to carry a concealed firearm and also contained two counts against the defendants for violation of his civil rights. The case was properly removed to the United States District Court in Boston.

      The Plaintiff has no evidence to support his claim 1., that the Town of Chatham engaged in a custom, policy or practice of arbitrarily denying applications to carry concealed, high capacity firearms or, 2, that any such custom, policy or practice was such that it demonstrated a deliberate indifference to the Plaintiff's constitutional rights and, 3., that the custom, policy or practice was the moving force behind the Plaintiff's constitutional deprivation. The Plaintiff has no evidence to support his claim that the Chief of Police's denial of his permit was arbitrary, capricious or an

abuse of discretion. The Chief of Police is entitled to qualified immunity.


II.     FACTS

The Plaintiff Garrett Ling resides in Chatham, Massachusetts.   He applied for a permit to carry a concealed handgun. (Exhibit A)   The application was received by the defendant Town of Chatham Police Dept.   on September 16, 2011.   Chief of Police Mark R. Pawlina denied the permit by letter of December 23, 2011 (Exhibit B).   The Chief stated    that the reason for the denial was that he determined that the Plaintiff was an unsuitable person as defined under the statute, M.G.L. c. 140, §131.   He detailed a number of incidents upon which he relied in making his decision. The Plaintiff was involved in incidents of consumption of alcohol as a minor, being present in a vehicle being operated by a subject who admitted to using illegal drugs, the Plaintiff's admission to using illegal drugs, and drugs and smoking materials recovered inside the vehicle. The Chief stated that because the incident was recent that he would be more comfortable, "as time passes and you can demonstrate in the future that there will be no more of these types of incidents." The Chief indicated that he would reevaluate the application and the Plaintiff's suitability status in a year.   He invited the Plaintiff to meet with him in a year, in November of 2012, to discuss suitability and the possibility of filing a new application for the permit.   (Exhibit "B")

The Plaintiff sought an application for a Class A license to carry in public, a concealed in public a large capacity weapon ("large capacity" referring to the amount of ammunition able to be held in the magazine). The Plaintiff was not initially disqualified pursuant to the so-called statutory disqualifications, i.e., he was an adult, he did not have a criminal record, he did not have a history of mental health treatment, and he was not a subject of a restraining order pursuant to M.G.L. c. 209(a).

2

M.G.L. c. 140, §131 grants the Chief of Police as the issuing authority, discretion in the determination of whether or not an applicant is a suitable person to carry a firearm and whether the applicant has "proper purposes" for such permit.

In his answers to interrogatories (Exhibit C), Ling stated that the defendant's denial was made with actual malice towards the Plaintiff's father, that the Second Amendment secures him the right to carry handguns for self-defense and that Massachusetts requires an individual to obtain a license for the carrying of handguns. (Exhibit C - answer to Interrogatory No. 16).

Plaintiff claims that his only monetary losses/ damages were for legal fees for this lawsuit, and for a deprivation of his constitutional rights and for the filing fee for the petition filed in the Orleans District Court.   He also said that he lost the ability to purchase a collectible handgun. (Exhibit C – answer to Interrogatory No. 19).

The Plaintiff claims that his job requires him to carry large sums of cash and valuable precious metals, making him a target of "criminal elements in our society."   He claims that the defendant, if he had his way, could cause him to suffer the same "fate as in the Cheshire, Connecticut home invasion murders which occurred on July 23, 2007."   (Exhibit C – answer to Interrogatory No. 21).

The Plaintiff refused to answer the interrogatory detailing his proper purposes and reasons for carrying a firearm (Exhibit C – answer to Interrogatory No. 23).

The Plaintiff said in Interrogatory No. 25 that the general public has the right to keep and bear arms as well as himself.   (Exhibit C – answer to Interrogatory No. 25).

Contrary to the Plaintiff's answers to interrogatories, the Plaintiff testified in his deposition that part of his job working with his father involved errands carrying silver coins to a coin dealer. Contrary to his claim that he carries large sums of cash, the value of the coins cash proceeds was

approximately $230.00.   (See Exhibit D, Deposition of the Plaintiff, p. 23, l. 1-13.)

The Plaintiff claimed that he applied for a large capacity permit because, "I would like to own rifles that hold more than ten rounds."   (See Exhibit D, p. 32, l. 23-24; p. 33, l. 1.)   When asked why he decided to own, purchase, carry or possess a handgun other than a rifle or shotgun, he said it was for self-defense (See Exhibit D, p. 33, l. 2-8.)

He claimed that he needed a concealed handgun rather than a rifle or shotgun.   (See Exhibit D, p. 33, l. 9-14.)   The Plaintiff testified that the Chief of Police told him that he would consider giving him a Class B permit which is a pistol permit for target shooting only and which would allow him to purchase and possess pistols for target and hunting only,   without the right to carry and conceal them.   (See Exhibit D, p. 35, l. 1-17.)

The Plaintiff testified that he never heard of anyone being denied a [license to carry in Chatham].   (See Exhibit D, p. 78, l. 15-18.)   Plaintiff claimed that his specific need to possess pistols or handguns with a large capacity or high capacity magazine were for all lawful purposes and self-defense, and that his need to have a weapon with a large capacity or high capacity magazine rather than a standard or small capacity was, "in case the criminals are carrying weapons that carry more than ten rounds."   He did not have a particular experience with being in contact with criminals other than claiming that his house had once been burglarized. (See Exhibit D, p. 84, l. 7-24.)

The Chief of Police testified in his deposition on January 4, 2013 to the following:

Q. Chief, let me ask you a few questions, kind of a summary of maybe a lot of what you've already said.   You are the authorized person in the police department to grant, deny, renew or fail to renew what we call permits to carry concealed handguns; correct?

A     Yes.

Q     And, first of all, we discussed something about the difference between a carrying

4

permit and FID cards; could you quickly summarize the difference, please.

A       Very simply, the FID card does not allow someone to carry a firearm; whereas, the license to carry is specifically set up to allow a person to carry a firearm in a concealed manner.

Q       It's fair to say that an FID card was generally issued for a long gun, a rifle or shotgun?
A       Yes.

Q       And that requires, I suppose, to be carried in an open manner?

A       Yes.

Q       And a carrying permit, primarily, is for a 15 handgun; but, an FID card wouldn't allow somebody to carry, say, a shotgun underneath a coat?

A       Would not allow someone to conceal a weapon on their person.

Q       An FID card would not grant the person the ability to purchase or possess a pistol?

A       Generally, yes, that's correct.

Q       And an FID card, what other requirements, if you know, are there for the issuance of an FID card?

A       I know one of them is the criminal record check, and that's the big one.

Q       So, basically, as we've been discussing, the issue of the chief's discretion based upon a person's suitability and a person's proper purpose, those are not considerations in the issuance of an FID card?

A       No, not -- not in the way it is for a license to carry, no.

Q       And is it fair to say, as long as someone does not have a disqualifying conviction, an FID card is issued?

A.      Yes.

Q       On a personal note, do you consider the issuance of an FID card and license to carry different in terms of importance in the seriousness of granting it?

A       Yes.

Q       And what is that?

5

A.      Yes, yes, they're very different, in the sense that the license to carry, in my mind, deserves much more scrutiny. And, also, certainly, based on the State statute, requires more scrutiny because that person is now allowed to carry a concealed firearm upon their person.

Q       And as we have discussed earlier, you denied [Plaintiff's] application; is that correct?

A       Yes.

Q       And you denied it because you found him to be an unsuitable person?

A       Yes.

Q.      Or not suitable, as the statute provides?

Plaintiff's Counsel; Objection.

A       Yes. He was not suitable to be granted a license to carry.

Q.      And did you form an opinion as to his suitability?

A       Yes.

Q.      And what was that opinion?

A.      My opinion was that because he was involved in a number of incidents involving alcohol and drugs and the use of and/or abuse of alcohol and drugs; also, as well as, a harassing/threatening incident in which he was directly involved, that just leads me to believe that he was rather immature and that he was engaged in (Witness referring to documents). One specific incident I'll refer to was in a car that was speeding where marijuana was smoked inside the car.   To me, what that indicates to me in terms of his suitability, he was just not a responsible enough person at that point, where I felt comfortable that he should be allowed to carry a firearm.

Q       And you base that opinion on the review of those reports?

A       Based on the review of the reports and my interview, discussion with him, as well.

Q       And that's the one (indicating) where he was found in a vehicle that was speeding and in which marijuana was present?

A       Yes.

Q       And in which he admitted he was smoking marijuana?

6

A       Yes.

Q.      And an incident where he was also involved at a party at a house involving underage persons and alcoholic beverages?

A.      Yes.

Q       And another incident in which he was present at a marina, a dock in Chatham, in which alcohol was present when he was a minor?

A       A pond where there was a party, yes, he was involved.

Q       And there was an incident involving him in which there was an allegation that he was making harassing telephone calls to a party; is that correct?

A       Yes.

Q       And those reports were authored by officers in your department?

A       Yes.

Q       You did not base your opinion on his suitability to carry a concealed weapon solely on a citation given to him for possession of marijuana?

A       No, I did not.

Q       And those incidents, from which you formed your basis for determining suitability, do you believe those were close enough in time from the time that he applied for the license to carry a firearm that they were still relevant?

A       Yes. They were in 2009; and, in my mind, still recent enough to cause me concern.

Q       And, notwithstanding the fact that there was essentially a typographical error, more or less, in the denial letter indicating that the last incident was November of 2011 –

A       Yes.

Q       -you believe that that was still recent enough to be of concern?

A       Yes. The -- there was a typo in the letter. That (indicating) date should have been November of 2009; and, I acknowledged that error, but -- However, there were several incidents, all in 2009, in my mind, which were still very recent.

Q       And those incidents you determined to be relevant in making your determination of suitability?

A       Yes, because collectively, they showed a pattern of irresponsible behavior.

7

Q        And at that point, you did not particularly make a determination of whether or not he had a proper purpose?

Plaintiff's Attorney: Objection.

A:   Yes. Again, the purpose was discussed at the meeting.   I didn't base my decision on suitability on his "purpose," but, again, his purpose -- when I asked him, he was very vague about the purpose.

Q        And what, if anything, did he give you, as far as examples, for what he determined that he -- his proper purpose was?

A        He first told me that he wanted to go hunting, and then, when I asked him about hunting, he was pretty vague on how much he went hunting, how involved in hunting he was. Then, he had changed it and indicated that he wanted it for target practice.   I noted that most people don't usually go hunting with a handgun, and at that point, I – at that point, he indicated that he wanted it, also, for target practice. So my conclusion was that he was pretty unclear and vague on the purpose.

Q        Do you recall if he gave you any good reasons, that -- to fear injury, when he was talking about the reason why he wanted a permit to carry a concealed firearm?

A        Not that I recall, that we discussed.

Q.        And he did not provide you with any explanation, that he needed to carry a concealed firearm for employment, or any other specific purpose?

Plaintiff's Attorney: Objection.

A: He did not indicate that employment was the reason.

Q        And he did not explain to you any reason, that he feared crime or personal injury beyond which anyone else does?

Plaintiff's Attorney: Objection.

A: Not that I recall.   When we were discussing purpose, he indicated that he wanted it for hunting, a n d  then, kind of changed i t , indicated that he wanted i t  for target practice. (Exhibit"E" the deposition of the defendant Chief of Police Mark Pawlina, January 4, 2013, pps 66-75.)

III.     ARGUMENT

A.     The Plaintiff's Petition to Appeal the Denial of the Firearms Permit.

The Massachusetts statute provides that; "a Class A license shall entitle a holder thereof to purchase, rent, lease, borrow, possess and carry (i) firearms, including large capacity firearms and feeding devices and ammunition therefore for all lawful purposes, subject to such restrictions relative to the possession, use or carrying of firearms as a licensing authority deems proper; and (ii) rifles and shotguns, including large capacity weapons, and feeding devices and ammunition therefore, for all lawful purposes; provided, however, that the licensing authority may impose such restrictions relative to the possession, use or carrying of large capacity rifles and shotguns as it deems proper."

Any person residing or having a place of business within the jurisdiction of the licensing authority or any law enforcement officer employed by the licensing authority or any person residing in an area of exclusive federal jurisdiction located within a city or town may submit to such licensing authority . . . an application for a Class A or Class B license to carry firearms, or renewal of the same, which such licensing authority or said colonel (of the state police) may issue if it appears that the applicant is   a suitable person to be issued such license, and that the applicant has good reason to fear injury to his person or property, or for any other reason, including the carrying of firearms for use in sport or target practice only, subject to such restrictions expressed or authorized under this section. . ." M. G. L. c. 140, § 131(d)

Procedurally, the process to appeal the Chief's denial is to appeal to the State District Court. There is no right to a jury trial in such an appeal, and the full range of procedures that apply to civil tort and contract actions do not apply to district court review of firearms cases." Howard v. Chief of Police of Wakefield, 59 Mass.App.Ct. 901, 794 N.E. 2d 604 (2003) (rescript). The

district court judge, "after a hearing may direct that a license be issued or reinstated to the petitioner if such justice finds that there was no reasonable grounds for denying, suspending or revoking such license and that the petitioner is not prohibited by law from possessing same."   M. G. L. c. 140, § 131(f). "Review" indicates a re-examination of a proceeding, already concluded, for the purpose of preventing a result which appears not to be based upon the exercise of an unbiased and reasonable judgment.   It does not import reversal of the earlier decision honestly made upon evidence which appears to an unprejudiced mind sufficient to warrant the decision made although of a character respecting the weight of which two impartial minds may well reach different conclusion and upon which the reviewing magistrate, if trying the whole issue afresh, might make a different finding."   Commissioner of Civil Service v. Municipal Court of the City of Boston, 369 Mass. 84, 377 N.E.2d 682 (1975).

Subject to specific exceptions set out by the statute, a Chief of Police may issue a carrying license "if it appears that the applicant is a suitable person to be issued such license" and has an acceptable reason for requesting such a license. M.G.L. c. 140, § 131 (d). The "suitable person" standard vests in the chief broad discretion or "considerable latitude."   Ruggiero v. Police Commissioner of Boston, 18 Mass. App.   Ct. 256, 464 N.E. 2d 104 (1984). In reviewing the Chief's decision, a judge must "find that there was no reasonable ground for denying, suspending or revoking such license...." M.G.L. c. 140, § 131(f). See Godfrey v. Chief of Police of Wellesley, 35 Mass.App.Ct. 42, 46, 616 N.E.2d 485 (1993).   To warrant such a finding, "it must be shown that the refusal [to grant the license] was arbitrary, capricious, or an abuse of discretion." Chief of Police of Shelburne v. Moyer, 16 Mass.App.Ct. 543, 546, 453 N.E.2d 461 (1983). The burden of making the showing is on the applicant. Ibid. "Hearsay evidence may be admitted on review in a district court.   The test should be one of relevance.   The weight and credibility accorded such

10

evidence is for the trial judge to decide in deciding the question whether a Chief of Police had any

reasonable grounds for refusing to grant a license or . . . whether a denial is arbitrary, capricious or

an abuse of discretion."   Chief of Police of Shelburne v. Mayer, 16 Mass. App. Ct. 543, 453

N.E.2d 461 (1983).   M.G.L. c. 94, § 34 specifically provides, "that departmental records which

are not public records, maintained by police and other law enforcement agencies shall not be

sealed."   Evidence concerning these records may properly have been used by the Chief of Police

in making his determination as to the defendant's fitness. Section 34 does not preclude the Chief of

Police from testifying to whatever information he had from any other source which he relied upon

in determining an applicant's fitness to be issued a license to carry firearms.   Chief of Police of

Shelburne v. Mayer, 16 Mass. App. Ct. 543, 453 N.E.2d 461 (1983).

 The Second Amendment applies to state and local regulation of firearms.   McDonald v.

City of Chicago, 130 S. Ct. 3020 (2010). In Heller, the court held *inter alia,* that a law that **totally**

bands handgun possession in the home violated the Second Amendment.   McDonald v. City of

Chicago, 130 S. Ct. 3020 (2010). Under the First Circuit analysis of Heller, the government may

regulate the carrying of concealed weapons outside the home.   Hightower v. City of Boston, 693

F.3d 61 (2012).   In Heller the Supreme Court explained that the rights secured by the Second

Amendment are not unlimited.   Hightower interpreted this portion of Heller as stating that laws

prohibiting the carrying of concealed weapons are an example of long standing restrictions that are

presumptively lawful under the Second Amendment.   Heller; Hightower v. City of Boston 693

F.3d 61 (2012).

 To the extent that Plaintiff here has made a facial attack on M.G.L. c. 140, regulating the

licensing of the carrying of firearms, claiming that the statute lacks any plainly legitimate sweep,

the standard is not met.   Hightower v. City of Boston 693 F.3d 61 (2012). Heller involved a "total

11

ban on handgun possession in the home."   This is not the case here as there is no total ban under

this statute nor by Chatham.

Police reports, notwithstanding their hearsay nature are admissible when making the

determination of suitability.   Charbonier v. Chief of Police of Melrose, 66 Mass. App. Ct. 1105

(2006). Here the Chief of Police properly relied on the reports from his Department in making his

decision.

The case law as a whole establishes that "suitable person" means a person who is

sufficiently responsible and skilled with firearms to hold a license without posing a risk to public

safety.   The standard is flexible and contemplates substantial discretion on the part of the

licensing authority during the application process; but a flexible standard is not the same as an

ambiguous one.   Pineiro v.   Gemme, and the City of Worcester, et al., D.Mass. (2011) W.L.

4853019; CA# 10-40262-FDS (October 12, 2011). The second standard is a good reason to fear

injury; the statute requires the applicant to demonstrate some specific circumstance given rise to

fear beyond those risks faced by the public at large.   Pineiro v. Gemme, and the City of Worcester,

et al., D.Mass. (2011) W.L. 4853019, CA# 10-40262-FDS (October 12, 2011). The statue doesn't

not give an exhaustive list of valid reasons for seeking a license; it merely provides that the

applicant must show "good reason to fear injury to his person or property, or… any other reason,

including the carrying of firearms for use in sport or target practice. M.G.L. c. 140 sec. 131 (d).

This "proper purpose" showing, while open-ended, is a prerequisite to license approval that is

distinct from the "suitable person" determination. Ruggiero v. Police Commissioner of Boston, 18

Mass. App.   Ct. 256, 464 N.E. 2d 104 (1984). Thus, when an applicant seeks a license solely for

self- protection, the license authority may rely on this purpose requirement in demanding that the

applicant distinguish his or her own needs from those of the general public Ruggiero v. Police

Commissioner of Boston, 18 Mass. App.   Ct. 256, 464 N.E. 2d 104 (1984). The Plaintiff has not

shown either that he is a suitable person nor that he has proper purposed.

Therefore, the defendants respectfully requests 1., that the Court find that the decision to

deny the Plaintiff's permit application was proper, based on substantial evidence, was not

arbitrary, capricious, or an abuse of discretion, and that the Plaintiff has not produced substantial

evidence to overturn the Chief's decision, and 2., enter an order upholding the Chief of Police's

decision to deny the permit.

      B.      Count I: Plaintiff's 42 U.S.C. 1983 v. the Town of Chatham.

The Plaintiff has no evidence to support a claim of liability against the Town.   In order to

support a 42 U.S.C. § 1983 claim against the Town, the Plaintiff must show that he was deprived of

a constitutional right, that the Town had a policy custom or practice of arbitrarily denying

applications to carry concealed, high capacity firearms, and that this custom, policy or practice was

such that it demonstrated a deliberate indifference to the Plaintiff's constitutional rights and was

the moving force behind the Plaintiff's constitutional deprivation.   Monell v. Department of

Social Services, 436 U.S. 658, 690 (1978); Young v. City of Providence, 404 F.3d 4 (1st Cir. 2005).

Plaintiff has no evidence to support a theory of municipal custom or practice.   Monell, 436 U.S. at

690.   In fact, the Plaintiff testified that he knew of no one else in town who had been denied a

permit.

For the above reasons, the defendant, Town of Chatham, respectfully requests that the

Court dismiss Count I alleging a violation of 42 U.S.C. §1983 against the Town of Chatham.

      C.      Count II: Plaintiff's 42 U.S.C. 1983 v. the Chief of Police.

            1. Qualified Immunity.

The Chief of Police properly considered the Plaintiff's petition for a firearm's permit and

made his decision to deny the permit based on substantial evidence. There is no evidence that the decision was arbitrary, capricious or an abuse of discretion. The Plaintiff has no evidence to support any claim that there were any improper grounds for the denial.   The Plaintiff also claims that the Chief violated his rights under the Second Amendment of the United States Constitution with regard to the possession of firearms.

The Chief of Police simply did his duty in deciding on the application for a firearm's permit. He is entitled to qualified immunity under these circumstances.   The Chief's conduct in the review and denial of the firearm's permit was objectively reasonable.   The qualified immunity standard here is an objective one, that is, whether a reasonable official in the same position would believe that his actions were lawful in light of clearly established law and the information that the official possessed at the time of the alleged unlawful conduct.   Febus-Rodriguez v. Bettencourt-LeBron, 14 F.3d 87, 91 (1st Cir. 1994).   Government officials performing discretionary functions, such as here, generally are shielded from liability for civil damages insofar that the conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.   Howell v. Fitzgerald, 457 U.S. 800 (1982).   The objective reasonableness standard is one of an objective reasonable actor, standing in the defendant's shoes, would reasonably have acted in the same manner as the defendant here.   Freud v. Farrell, 765 F.2d 1 (1st Cir. 1985).   The Plaintiff before commencing suit must be with a *prima facie* case of the defendant's knowledge of improper conduct, actual or constructive.   To hold less, would defeat the entire purpose of freeing government officials from having to defend in substantial suits.   Woodly v. Town of Nantucket, 645 F.2d 24 (1st Cir. 1984).   In this case, the Plaintiff has made references to his Second Amendment right to firearms.   The contours of these rights must be sufficiently clear that a reasonable official would understand that he is doing

14

violated the right.    See <u>Anderson v. Creighton</u>, 483 U.S. 635 (1987).    Currently, there is no

clearly established standard based on the most recent cases from the U.S. Supreme Court and other

courts as to whether or not the Massachusetts statute governing the issuance of firearms permits

violates the Second Amendment. In fact, those cases have indicated that states have the right to

reasonably regulate the licensing of firearms.    Therefore, an objectively reasonable Chief of

Police would not have knowledge that he was violating the Plaintiff's Second Amendment

constitutional right by denying the permit.

   Therefore, the defendants hereby request that Count II of the Complaint against defendant,

Chief Mark Pawlina, be dismissed based on qualified immunity.

      2.    Plaintiff's Second Amendment Claim.

   The Second Amendment states "a well-regulated Militia being necessary for the security of

a free State, the right of the people to keep and bear Arms shall not be infringed."    U.S.

Constitution Amendment 2.    In <u>District of Columbia v. Heller</u>, 554 U.S. 570, 128 S.Ct. 2783, 171

L.Ed. 2d 637 (2008), the Supreme Court held that the Second Amendment guaranteed "an

individual right to possess or carry weapons in case of confrontation."    <u>Id</u>. at 592. The Second

Amendment applies to state and local regulations of firearms.    <u>McDonald v. City of Chicago,</u> 130

S.Ct. 3020 (2010).

   In <u>Heller</u>, some of the statutes at issue included a local ban on handgun ownership because

they prohibited an entire class of arms that is overwhelming chosen by American society for the

lawful purpose of self-defense.    <u>Heller,</u> 554 U.S. at 630.    The <u>Heller</u> Court did not identify a

standard of review for regulations that restrict Second Amendment rights apart from rejecting a

rational basis review and rejecting an interest balancing test.    <u>Id</u>. at 11.    The <u>Heller</u> Court was

careful to note that the rights guaranteed by the Second Amendment were "not unlimited."

Heller, 554 U.S. at 628.   Indeed, many gun control regulations were "left intact by the Second

Amendment and Heller, including laws prohibiting the carrying of concealed weapons, laws

prohibiting the possession of firearms by felons and the mentally ill, laws prohibiting the carrying

of firearms in sensitive places such as schools and governmental buildings, laws imposing

conditions and qualifications on the commercial sale of arms and laws prohibiting the carrying of

dangerous and unusual weapons.   Heller, 554 U.S. at 626-627.   See also, Hightower v. City of

Boston, 822 F.Supp. 2d 38 (2011)m Casper, J.

     Neither Heller nor the Second Amendment creates or preserves any right to carry a

handgun in a concealed manner nor any right to a large capacity firearm. It is permissible for a

legislature to ban such conduct outright, never mind restrict it, without running afoul of the Second

Amendment.   United States v. Renee E., 583 F.3d (1st Cir. 2009).   The Plaintiff here has made no

showing as to why only a concealed large capacity handgun is necessary for his self-defense.

Because the Plaintiff has not so shown nor has he sought or nor even been denied the type of

license which might be protected by the Second Amendment (i.e. a rifle or shotgun), his Second

Amendment claim is unripe. Self-defense does not necessarily require the issuance of a Class A

high capacity, concealed pistol permit.   Renee E. makes clear that post-Heller, the Second

Amendment cannot be interpreted to confer right to an unrestricted Class A license which permits

both concealed carrying and the possession of high capacity firearms.   Hightower v. City of

Boston, 822 F.Supp. 2d 38, 54 (2011).   Considering other possible constitutional violations, the

statute provides for substantial protection and adequate procedural due process. It creates a right

for a person, such as the Plaintiff, who has been denied a permit, the right to a judicial review or

"appeal."   Again, the Plaintiff is free to apply for a permit that allows him to possess a shotgun

or a rifle.

16

A statute prohibiting an entire class of arms or which imposes a requirement that firearms be kept inoperable in a home is not permitted.   That is not the case here.   The Massachusetts licensing statutory scheme does not strike at the heart of the Second Amendment.   It has no impact on the Plaintiff's ability to defend his hearth and home which he can do adequately with a restricted license or permit for a rifle or shotgun (a Class B license, or a firearm's identification card.)   Massachusetts law provide for a firearm's identification card (FID Card – M.G.L. c. 140, Section 129B.) This card allows the holder to own or possess a firearm within the holder's residence and place of business but not to carry it to any other place.   <u>Commonwealth v. Powell</u>, 459 Mass. 572, 946 N.E. 2d 114 (2011).

This statute, because it imposes only case by case restrictions, creates a narrower restraint than the categorical provisions that under certain circumstances survive Second Amendment review.   M. G.L. c. 140, Section 131(d) <u>Hightower</u> at p. 63.

A right secured by the Second Amendment is not unlimited.   <u>District of Columbia v. Heller</u>, 554 U.S. 570, 128 S.Ct. 2817. (2008)   <u>Heller</u> recognized another important limitation on the right to keep and carry arms, and that is to prohibit the carrying of dangerous and unusual weapons.   <u>Heller</u> at 2817.

In order for the Plaintiff to succeed on his Second Amendment claim, he has to show that his license denial as applied to his ability to carry concealed handguns in public amounts to a Second Amendment violation. He has not.   The Plaintiff's desire to be able to carry a concealed, high capacity firearm outside his home is distinct from the core interest emphasized in <u>Heller</u> because, under <u>Heller</u>, the government may regulate the carrying of concealed weapons outside the home. The Supreme Judicial Court has not had the opportunity to interpret the statute (M.G.L. 140, Section 131).   Massachusetts courts have stated that, "the licensing authority (police chief) is

given considerable latitude in determining who is a suitable person. <u>Ruggiero v. Police Commissioner</u>, 18 Mass. App. Ct. 256, 464 N.E. 2d 104 (1984).   The Plaintiff has not made a claim that other constitutional rights have been violated nor is he claiming that there was any procedural due process or post deprivation inadequacy.   It is clear, however, as discussed above, that the statute provides for adequate post deprivation process.

For the above reasons, the Defendants respectfully request that Count II alleging a violation of 42  U.S.C. 1983 against the Chief of Police be dismissed.

D.    <u>Plaintiff's Claim That the Delay in The Denial of the Permit is Actionable.</u>

The Plaintiff has also made a claim in his Amended Complaint of an additional violation, when the Chief of Police failed to respond to the application within 40 days.

The 40 day "time limit" does not create a cause of action. It is simply a time limit for the police chief to respond to an application for a firearm permit. The violation of the 40 day time limit does not create any new or additional damages. The purpose of the 40 days for a response is solely to start the clock running for a petitioner or applicant to appeal a denial to the District Court. <u>Commonwealth v. Farley</u>, 64 Mass. App. Ct. 854, 835 N.E. 2d 1159 (2005).   <u>Farley</u> was an appeal of a criminal conviction for unlawful possession of a firearm in which the Defendant's application or lack thereof was an issue as to whether or not the Defendant was aware that he was not properly licensed to carry a firearm. The Court said at 1170, "we reject the Defendant's claim that an instruction should have been given (to the jury) that G.L. c. 140, Section 131(e) requires that the police department must 'notify the applicant of the reason for such denial in writing.'" The issue in <u>Farley</u> was whether the Defendant had sought renewal of his expired license and there was evidence that the Defendant had been orally informed of the denial but no evidence that written notification was ever sent.

The Court went on to say, "[t]he statute requires that 'the licensing authority shall, within 40 days from the date of application, either approve the application and issue the license or deny the application and notify the applicant of the reason for such denial in writing."   In addition, "any revocation or suspension of a license shall be in writing and shall state the reasons therefore." The applicant may file a petition to seek judicial review of an adverse decision "within either 90 days after receiving notice of such denial, revocation or suspension *or within 90 days after the expiration of the time limit during which the licensing authority is required to respond to the applicant."* (emphasis added)   "General Law c. 140, Section 131F does not contain language that the denial is ineffective if not in writing."   Rather, the requirement of notice in writing is directed to the applicant's statutory right to seek review of the adverse decision: "the receipt of the notice triggers the running of the review period, as does the failure to provide notice within 40 days from the date of application."   G.L. c. 140, Section 131(e).   "General Law c. 140, Section 131(m) does not state that notice of revocation, suspension or denial must be made in accordance with the statute.   We have held that in certain circumstances, for purposes of appeal, notices under the statute may be constructive."

Although Farley was about constructive versus actual notice, the Appeals Court said that the purpose of the 40 day period was simply to start the time for appeal.   In other words, the Appeals Court said that if an applicant does not receive the denial notice within 40 days of his application, he may file his appeal at that time.   A violation of the 40 day time limit does not create any cause of action.   Further, the Plaintiff has made no allegations that the delay caused him any loss or damage.

Therefore, for all of the above reasons, the Defendants respectfully request that Summary Judgment be entered for the Defendants and the Petition and Complaint be dismissed.

19

Respectfully submitted,

Defendants,
By their attorney,


/s/ Bradford N. Louison
_____

Bradford N. Louison (BBO #305755)
Louison, Costello, Condon & Pfaff, LLP
101 Summer Street
Boston, MA 02110
blouison@lccplaw.com
(617) 439-0305


## CERTIFICATE OF SERVICE

      I, Bradford N. Louison, hereby certify that this document(s) filed  through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on **March 27, 2013.**


/s/ Bradford N. Louison
_____

Bradford N. Louison