EXHIBIT "4"

1                        UNITED STATES DISTRICT COURT
2                          DISTRICT OF MASSACHUSETTS

3

4    GARRETT W. LING

5    -vs-                                C.A. No. 12-CV-10460-JCB

6    TOWN OF CHATHAM,
     CHATHAM POLICE DEPARTMENT
7    MARK R. PAWLINA, CHIEF

8

9

10            DEPOSITION OF GARRETT W. LING, a witness of

11   lawful age, taken on behalf of the Defendants, in an

12   action pending in the District Court of the United States

13   for the District of Massachusetts, pursuant to notice,

14   before Roger Goudreau, a Notary Public in and for the

15   Commonwealth of Massachusetts, at the offices of Goudreau

16   & Grossi Court Reporting Service, Inc., 63 Winthrop

17   Street, Taunton, Massachusetts, commencing at 10:00 a.m.

18   on Wednesday, the 22nd day of August, 2012.

19

20

21

22                        * * * * *
                        Goudreau & Grossi
23                Court Reporting Service, Inc.
                      63 Winthrop Street
24                   Taunton, MA  02780
                       (508) 823-4659

Goudreau & Grossi Court Reporting Service, Inc.

9

| 1 | A | I'm not sure yet. |
|---|---|---|
| 2 | Q | Okay.  You're not married. |
| 3 | A | No. |
| 4 | Q | You have no children. |
| 5 | A | No. |
| 6 | Q | How long have you been working for your father's |
| 7 | | business? |
| 8 | A | Been two years.  But I've had to take a leave of |
| 9 | | absence several times due to medical surgeries. |
| 10 | | Three different medical surgeries. |
| 11 | Q | What are those for? |
| 12 | A | I broke my leg at the end of 2009, and I had to |
| 13 | | have my first surgery in 2010.  I had my whole leg |
| 14 | | reconstructed.  And then in the spring of 2011 I |
| 15 | | had to have the ligaments repaired in my knee |
| 16 | | again, the same leg that I broke.  And then this |
| 17 | | year, in March, I had to have surgery on my chest |
| 18 | | and on my collarbone. |
| 19 | Q | Were any of those two injuries or surgeries the |
| 20 | | result of an accident? |
| 21 | A | Yes.  A motorcycle accident. |
| 22 | Q | I see.  Both of them? |
| 23 | A | Yes. |
| 24 | Q | Two separate motorcycle accidents? |

```
 1          this one, either suing somebody, or being sued?
 2     A    No, sir.
 3     Q    Have you ever had an insurance claim for any type
 4          of injury or accident or a claim of any type?
 5     A    No, sir.
 6     Q    And the two motorcycle accidents, no claims or
 7          anything about those?
 8     A    No claims.
 9     Q    All right.  And have you ever been in court before
10          for anything?
11     A    Yes.
12     Q    Could you tell me what?
13     A    A speeding ticket.
14     Q    And what court was that?
15     A    Orleans District Court.
16     Q    Anything else other than that?
17     A    No, sir.
18     Q    You don't have any children, so you don't have to
19          pay child support.  And you don't have any
20          outstanding tax debts.
21     A    No, sir.
22     Q    All right.  What I was going to do today is just go
23          through some documents, starting with the
24          complaint, and ask you questions about things and
```

1        is the page four on the thing.  So it says here,

2        paragraph eight, that you have held a firearms

3        identification card, an FID card, since 2008; is

4        that correct?

5  A  Yes, sir.

6  Q  And do you own or possess any rifles or other types

7        of weapons?

8  A  Yes.

9  Q  And could you tell me what?

10  A  .12 gauge shotguns, two of them.

11  Q  Yes.

12  A  And a .22 long rifle.

13  Q  Okay.  And you keep those at the house?

14  A  Yes, sir.

15  Q  All right.

16  A  I actually keep them at my mother's house.

17  Q  Where does your mother live?

18  A  45 Winter Home Road in Chatham.

19  Q  How far is that from your grandmother's house?

20  A  It's adjacent.  Next door.  Adjacent property next

21        door.

22  Q  All right.  What is the status of your father and

23        mother's relationship, are they divorced?

24  A  Yes, they're divorced.

16

1        ahead.

2   A   As a business aspect my job does not directly

3        require me to carry a handgun, but common sense

4        dictates self-defense.  I carry a lot of precious

5        metals.  I buy and sell precious metals.  I am in

6        charge of picking up and delivering the copper from

7        the supply house to the job site, which is now

8        considered actually a precious metal because of

9        price.

10               I've had three different medical

11        surgeries which prohibits me from fleeing from a

12        criminal or from physically defending myself.

13   Q   Keep on going.  Let me know when you've finished.

14   A   That's it.

15   Q   So getting back to what you first said about the

16        precious metals.  Tell me about that.  What are you

17        talking about?  What business is it that you have

18        some precious metals?

19   A   Sometimes my father will get paid in silver or gold

20        from some of his clients.  And I am in charge to

21        deliver, either sell or buy gold from Sinclair

22        Metals in Orleans.

23   Q   And when you say your father gets paid in silver

24        and gold, what does that mean?  When he does septic

1       check?

2   A   Cash.

3   Q   Is there any receipt or anything like that?

4   A   No.

5   Q   Does he ask you where you got those?

6   A   No.  We're on a first name basis.  I've been

7       dealing with him for years, so it's nothing out of

8       the ordinary.

9   Q   All right.  And then you take the cash home to your

10      father?

11  A   Yes.

12  Q   All right.  So that, you said, was one of the

13      reasons that you wanted a carrying permit?

14  A   Yes.

15  Q   And then there was the scrap wire?

16  A   Yes.

17  Q   And do you also turn that in to Doug Sinclair?

18  A   Yes.

19  Q   How does he value that?

20  A   Spot price.  The same thing.  It also depends

21      whether the wire is sheath or unsheathed.

22  Q   And other than the carrying of the coins and the

23      metals, did you say any other reason, specific

24      reason that you wanted a gun?

1   A   Yes.  My physical handicaps.

2   Q   And what is that?

3   A   I've had three different surgeries, two of which

4       have been on my left leg, one of which has been on

5       my chest.  If I take one hard hit to my chest there

6       is a possibility I could die instantly.  My leg was

7       on the verge of being amputated, but thankfully the

8       surgeon saved it.

9   Q   Tell me exactly the reason because of those

10      injuries that you need to carry a concealed

11      handgun.

12  A   I cannot flee from a criminal if I were being

13      attacked due to my leg injury.  And I cannot

14      physically fight back due to my chest injury.

15  Q   Now do you carry a rifle or a shotgun in your car

16      when you take the metals to Sinclair Metals?

17  A   No, I don't.

18  Q   Why not?

19  A   It's not legal.  Unless it's in a locked

20      compartment of the car, which is useless in

21      self-defense anyways.  I don't have time to unlock

22      my truck and unlock the trigger lock and then pull

23      it on the criminal.  So to me there's no point.

24  Q   Prior to you applying for and receiving your FID

1     card, was there any requirement of taking any type

2     of a gun course?

3  A  Yes.  I was required to take a three-hour gun

4     course at the Powderhorn in Hyannis.

5  Q  What's a Powderhorn?

6  A  It is a gun shop in Hyannis.

7  Q  Okay.

8  A  And upon completion of that course you have to meet

9     with the instructor, who is also the owner of the

10    Powderhorn, Mark Cohen, and he has to go down to

11    the shooting range with you and you shoot ten

12    rounds through a revolver.  And he makes sure that

13    you can physically shoot a gun and know what to

14    do.

15 Q  Let me just ask you, I was wondering about the FID

16    card.  Is that different?

17 A  This is all the process you have to go through to

18    get the FID card.  So once you go through the

19    three-hour night course at the Powderhorn, the next

20    day, or whenever you're scheduled with the

21    instructor, you have to go down to the local

22    shooting range.  Which we went to Bass River Rod

23    and Gun.  We shoot ten rounds through the revolver.

24    He makes sure you can shoot the gun and know what

1   you're doing.  And then you take a ten question

2   multiple quiz with him directly after.  And upon

3   completion of that, he writes off a certificate of

4   your completion of a gun safety course.

5   Q   And you just fired a revolver, you said.

6   A   Yes.

7   Q   Not a long rifle or a shotgun or anything else.

8   A   No.

9   Q   Now do you know whether or not there was a

10  requirement to take any other type of course to

11  obtain a carrying permit in Chatham?

12  A   I believe that is the course that is required.

13  Q   For both the FID card and the carrying permit?

14  A   Yes.

15  Q   All right.

16  A   And I did, in fact, take another course in

17  Falmouth.  It was a week-long course to get my

18  hunter's certificate safety card.  And I took that

19  at Falmouth Rod and Gun Club.

20  Q   And what does that comprise of?

21  A   It was five days, about five hours each day, and

22  you meet in a classroom setting with about 20 other

23  people and you go through the long list of all the

24  different animals you're legally allowed to hunt

```
 1            and how you're supposed to hunt them and the ethics

 2            of hunting and so forth.  And then upon completion

 3            of that you take the test.  And if you pass, you

 4            get your hunter's certificate.

 5     Q    And it's five days, five hours each day?

 6     A    Yes.  It was a long haul.

 7                      MR. CONNORS:  Off the record.

 8                      (Off the record).

 9     Q    Have you ever had an incident where you were

10          robbed?

11     A    Yes, I have.

12     Q    Could you describe that?

13     A    Sure.  In 2008, two individuals broke into my house

14          during daytime and stole my father's safe which

15          contained about $50,000 cash in it.

16     Q    Was anybody home at the time?

17     A    Yes.  My 80-year-old grandmother, in oxygen, was

18          home.  She did not hear the burglars because of her

19          oxygen machine.

20     Q    Was it reported to the police?

21     A    Yes.

22     Q    Was anybody ever caught?

23     A    Yes.  Both burglars were convicted.

24     Q    Who were they?
```

| | | |
|---|---|---|
| 1 | A | Jesse Cunha and Eric Caterino. |
| 2 | Q | Did you know those guys prior to this? |
| 3 | A | Yes, I did. |
| 4 | Q | How did you know them? |
| 5 | A | They were my classmates. |
| 6 | Q | Did they somehow know that your father kept coins |
| 7 | | in a safe? |
| 8 | A | Yes. |
| 9 | Q | How did they learn that? |
| 10 | A | Well, they saw a safe.  They didn't know what was |
| 11 | | in it, so they assumed there was money in it. |
| 12 | Q | Any other incidents? |
| 13 | A | No. |
| 14 | Q | Have you ever had any robberies or attempted |
| 15 | | robberies when you were transporting coins to Doug |
| 16 | | Sinclair Metals? |
| 17 | A | No. |
| 18 | Q | Have you ever been assaulted?  As we were talking |
| 19 | | about your inability to fight back. |
| 20 | A | No, I have not. |
| 21 | Q | I'm just going through this.  So you have never |
| 22 | | been under treatment or confinement for drug |
| 23 | | addiction. |
| 24 | A | Correct. |

```
 1    Q   Do you use any drugs now for anything?
 2    A   No, I don't.
 3    Q   Any prescription medication for any of your
 4        injuries or anything like that?
 5    A   No, I don't.
 6    Q   You've never been the subject of a restraining
 7        order.
 8    A   No, sir.
 9    Q   Does your father have any type of firearms permit?
10    A   No.
11    Q   Te date of the application for the carrying permit
12        was -- well, the police received it September 16,
13        2011.  So it's fair to say it was last fall.
14    A   Correct.
15    Q   And tell me the process in which you applied.
16    A   Sure.  I called the police station, and Sgt.
17        Goddard is in charge of all the firearms
18        applications.  So the dispatcher let Officer
19        Goddard know that I was on my way down to the
20        police station to fill out a license to carry
21        firearms permit.
22                    So Mr. Goddard met me down at the
23        police station.  And he sits in front of the
24        computer and he asks you questions on the form.
```

1      And you have to truthfully answer the questions.

2      And then I think I paid $100, and he processed the

3      application.

4   Q  Does he take your picture?

5   A  I already have my picture on file, along with my

6      fingerprints.  And I asked him how long it would

7      take.  And he said since I already have my firearms

8      identification card, it is merely a procedure,

9      formality, just to upgrade.  And it should only

10     take about two weeks.  Because they have my

11     fingerprints, and check my background.  And he said

12     once that I receive my license to carry, he asked

13     that I come down to the police station and drop off

14     my firearms identification card so I don't have two

15     separate forms of identification to purchase

16     guns.

17  Q  Do you have friends or acquaintances in Chatham

18     that have carrying permits?

19  A  Yes.

20  Q  And could you just, if you wouldn't mind, just to

21     the best you can recall, the names of those people?

22                 MR. CONNORS:  Objection.

23  A  Justin Jacinto, who is actually of Harwich.

24  Q  He works in Chatham?

34

1   A   In a locked safe.

2   Q   Do they have a trigger lock or are they just in a
3       locked safe?

4   A   Trigger lock, and a locked safe.

5   Q   So, anyway, you went to see Sgt. Goddard.

6   A   Yes.

7   Q   And applied for it.  And then what happened after
8       that?

9   A   He, you know, he informed me it was going to be a
10      couple of weeks.  So about two months went by, and
11      still I got no word, no letter.  And I called the
12      Chatham Police Department, and I said I would like
13      to schedule an appointment with Chief Pawlina to
14      discuss the delay of my permit.  So the dispatcher
15      called me back with a time and a date to come down
16      and meet with Chief Pawlina.

17                  And upon the meeting, I asked Chief
18      Pawlina what was his basis for a delay.  And he
19      went along to tell me, and I quote, "Are you aware
20      of the incident that happened a few months ago?"
21      And I said, "The incident regarding my father?"
22      He said, "Yes.  Imagine that incident with a gun
23      involved.  It could have been very dangerous."  And
24      to me, that's lodging my father's --

Goudreau & Grossi Court Reporting Service, Inc.

42

1    Q   He talks about a number of specific incidents in

2          paragraph two.  He says, you know, some of the

3          reasons that you are deemed to be unsuitable and an

4          unsuitable person for the issuance of the permit is

5          that there were a number of incidents you were

6          involved in as a minor.  Consumption of alcohol

7          being involved.  And being a passenger in a vehicle

8          being operated by a subject who admitted to using

9          illegal drugs.  I have the police incident report,

10         but we can start here.

11                Now he says there was an incident

12         where you also admitted to using illegal drugs.

13         And said drugs and smoking material -- I'm assuming

14         that's marijuana -- were recovered in the vehicle.

15         And this happened in November of 2011.  Do you

16         remember a -- let's start first with that incident.

17         Do you remember some sort of an incident in

18         November of 2011?

19    A   No.

20    Q   Was there some incident where you were in a car and

21         the police stopped the car?

22    A   No.

23    Q   You don't have any recollection of an incident in

24         November of 2011 involving the police or some sort

Goudreau & Grossi Court Reporting Service, Inc.

43

```
 1            of marijuana by somebody that you were with?
 2      A     No, I don't.
 3      Q     And that date, November 2011, is after you applied
 4            for the permit in September of 2011.  And let me
 5            ask you this.  What was the date again of the
 6            meeting that you had with the chief, or the
 7            approximate date?
 8      A     Approximately it was --
 9      Q     Or the month.
10      A     I think it was in about October.
11      Q     Okay.
12      A     End of October, I think.
13      Q     And do you have a recollection of what he's
14            referring to in the first sentence of paragraph two
15            where he says as a minor you were involved in
16            several incidents with the consumption of alcohol?
17      A     Yes.  I tried looking into that, and I don't have
18            any recollection of that incident.
19      Q     Okay.  And he says in paragraph three that he'll
20            reevaluate it, and wanted you to make an
21            appointment with him in November of 2012.
22      A     Correct.
23      Q     Okay.  And he says, "We'll do a review of your
24            record, and if your record is clean, we can then
```

45

```
 1                         (An incident report for 1-24-09 was
 2                    marked as Exhibit No. 2).

 3     Q   Garrett, why don't you and your attorney take a
 4         look at that.  This has to do with a report of a
 5         liquor law violation dated January 24, 2009.  About
 6         a report of an underage drinking party at 41 Indian
 7         Trail in Chatham at the Whitcomb residence.
 8         Evidently the parents weren't home and there was a
 9         party.  If you go to page four.  Number 18 has your
10         name.

11                         Do you remember an incident involving
12         an underage drinking party at the Whitcomb house?
13     A   Vaguely.
14     Q   Okay.  Zachary Whitcomb was there, age 15.  The
15         parents were away for the night.  Down at number
16         18, Garrett W. Ling.  What school were you in at
17         the time?
18     A   Let's see, 2009, I was at Cape Cod Community
19         College.
20     Q   What does Chatham Elementary mean?  Does your
21         mother or father work there?
22     A   No.
23     Q   Do you have any reason why the police listed your
24         employer as Chatham Elementary?
```

```
 1    A    I have no idea.
 2    Q    And going on.  In the last, the third page from the
 3         end, an Officer Massey talked about an underage
 4         alcohol party at the Whitcomb residence and there
 5         was a fight there, um, et cetera.  Do you have a
 6         recollection of attending that party?
 7    A    Yes.
 8    Q    All right.  Was Zachary Whitcomb a friend of yours?
 9    A    A classmate, if you want to call it that.
10    Q    Do you know how the police officer obtained the
11         names of the youths that were at the party?
12    A    I don't.
13    Q    Did the police contact your parents?
14    A    No.
15    Q    Did you get in trouble at school?
16    A    No.
17    Q    Did the principal -- paul Mangelinkx, who is he,
18         the principal of the high school?
19    A    Yes.
20    Q    You weren't in high school at the time.
21    A    No.
22    Q    So he didn't have anything to do with you.
23    A    No.
24    Q    Did the police contact you, or did you have to go
```

47

```
 1           speak to them?
 2    A      No.
 3    Q      Were you aware of the police investigation of this
 4           particular party?
 5    A      No.
 6    Q      Do you see the names of all these people?
 7    A      Yes.
 8    Q      A lot of them are, you know, people around your
 9           age.
10    A      Uh-huh.
11    Q      Were these people that were at the party?
12    A      Yes.
13    Q      Did you see the police come to the party when you
14           were there?
15    A      No.
16    Q      Were you there when the police came, or had you
17           left, or what?
18    A      I don't recall.
19    Q      Do you recall if you were drinking alcohol at that
20           party?
21    A      No, I wasn't.  I was driving.
22    Q      Do you know about a fight at the party?
23    A      Vaguely.
24    Q      Who got in a fight?
```

Goudreau & Grossi Court Reporting Service, Inc.

48

```
 1    A    A couple of females.
 2    Q    I'm just trying to determine -- oh, well, it looks
 3         like the police investigation started the next day.
 4         So maybe the police weren't there that night.  The
 5         police information regarding underage drinking
 6         party that took place last night at 41 Indian
 7         Trail.  Okay.
 8                   MR. LOUISON:  Would you mark this?
 9         This is a document which is a Chatham police
10         document regarding an incident February 22, 2009.
11         Could you mark that Exhibit 3, please.
12                        (An incident report for 2-22-09 was
13                        marked as Exhibit No. 3).
14    Q    This involves a complaint or some sort of
15         investigation relative to harassing phone calls to
16         Jesse Cunha, who you mentioned earlier as the one
17         who was arrested for breaking and entering and
18         stealing the safe at your house, your grandmother's
19         house.  Um, harassing phone calls.  Evidently it
20         says here that Jesse Cunha said Kyle Kalinowski and
21         Gary Ling were calling from Pat Reynolds's cell
22         phone, threatening to go to Cunha's house and beat
23         him up.  Do you recall this investigation?
24    A    Yes.
```

Goudreau & Grossi Court Reporting Service, Inc.

```
 1    Q   All right.  Do you mind telling me what happened?
 2    A   I got called down to the police station for
 3        questioning regarding threatening phone calls to
 4        Jesse Cunha, and I denied everything.  I have no
 5        idea why my name was brought up.  And that was the
 6        end of it.
 7    Q   Jesse Cunha, is he the same Jesse Cunha that you
 8        mentioned that broke into your house?
 9    A   Yes.
10    Q   You had mentioned that in 2008 Jesse Cunha had
11        broken into your house, and this incident occurred
12        in 2009, so it's fair to say that it was after the
13        break-in.
14    A   Yes.
15    Q   And you knew that Jesse Cunha had broken into your
16        house as of February 22, 2009.
17    A   Yes.
18    Q   Okay.  Do you have any recollection of Kyle
19        Kalinowski making harassing phone calls to Jesse
20        Cunha?
21    A   No, I don't.
22    Q   Did you call him and threaten him because of
23        stealing the money from your house?
24    A   No, I didn't.
```

50

1   Q   Who's Pat Reynolds?

2   A   Another classmate.

3   Q   And who's Kyle Kalinowski?

4   A   Another classmate.

5   Q   Do you recall any phone calls made to Jesse Cunha?

6   A   No.

7   Q   Threatening or otherwise?

8   A   No.

9   Q   Harassing?

10   A   No.

11   Q   So the police reported that Jesse Cunha said he had

12       been getting harassing phone calls from Kyle

13       Kalinowski and Garrett Ling. He said they were

14       more harassing than threatening. And that they

15       were calling from -- they had been calling his cell

16       phone, excuse me. And that the caller ID on his

17       phone displayed either restricted or the number for

18       Pat Reynolds's cell phone. And when he gets the

19       call, the caller makes the comments about joining a

20       gang. The caller refers to the, something like a

21       909 gang. It's cut off a little bit. There are

22       also comments about stealing a safe again. Do you

23       know anything about a reference to joining a gang

24       or something called a 909 gang?

54

```
1     Q   You don't know her?

2     A   No, I don't.

3     Q   Then somebody by the name of Mr. Treat -- who is

4         Mr. Treat?  Do you know him?

5     A   I don't know him.

6     Q   Came up from the beach.  Were you there this day?

7     A   Yes.

8     Q   What do you recall happening?

9     A   There was a large group of us socializing down

10        there, and I believe someone called in a noise

11        complaint.  And the police arrived and told

12        everyone we need to leave the Landing because it's

13        too much noise, and they were receiving noise

14        complaints.

15    Q   This was around midnight that night?

16    A   Yes.

17    Q   So what happened?

18    A   So everyone got in their cars and we left.  And

19        there was one car that didn't have an operator in

20        it, and I believe the cops stayed with that car.

21    Q   And you don't know who that was?

22    A   No.

23    Q   A bottle of hard liquor, hard alcohol, was located

24        in the vehicle in plain view.  Both subjects were
```

Goudreau & Grossi Court Reporting Service, Inc.

```
 1    A    Correct.

 2    Q    Now just going over answer number 11.  You

 3         mentioned earlier, and I just want to clarify, Sgt.

 4         Goddard, when you came in, originally said

 5         basically you already have an FID card, it

 6         shouldn't be a problem getting a carrying permit.

 7         Correct?

 8    A    Yes.

 9    Q    But the chief never said anything like that, did

10         he?

11    A    No.

12    Q    Other than what's in the denial letter about coming

13         back in November of 2012 to reapply, did he ever

14         say anything verbally about something like that to

15         you?

16    A    About coming back in in November?

17    Q    Coming back.

18    A    No, he didn't.

19    Q    And you have never talked to him since that.

20    A    No.

21    Q    Have you ever seen him around?

22    A    I haven't.

23    Q    Now in answer to interrogatory number 12, you talk

24         about, um, your home was burgled, b-u-r-g-l-e-d,
```



```
 1              and personal property was taken and that the
 2              criminals were convicted of burglary.  Now we
 3              talked about that.
 4       A     Correct.
 5       Q     And you had indicated to me when we were talking
 6              about the harassing phone call incident that, I
 7              think you said you didn't have any issues with Mr.
 8              Cunha.
 9       A     Correct.
10       Q     And Cunha, you didn't think, had any issues with
11              you, or he didn't say he did.
12       A     Correct.
13       Q     So why do you fear reprisals from these
14              individuals?
15       A     The criminals are unpredictable, and I don't trust
16              them.
17       Q     Could you tell me, are there any specific incidents
18              where you have received threats or some sort of
19              indication that you should fear these people?
20       A     I actually ran into one of the convicted criminals
21              at Cape Cod Community College.
22       Q     Which one?
23       A     Eric Caterino.  And we did not directly verbally
24              speak, but I felt very intimidated as he was
```

71

1    A    Just a very strange grin.

2    Q    Did you complain to the police at Cape Cod

3         Community College?

4    A    No.

5    Q    Or at any police department?

6    A    No.

7    Q    Make a report?

8    A    No.

9    Q    Ask for a restraining order or anything like that?

10   A    No.

11   Q    Other than that incident, have you had any specific

12        incidences with either Cunha or, um, that

13        individual?

14   A    No.

15   Q    And the burglary was in what year?

16   A    '08.

17   Q    2008?

18   A    Yes.

19   Q    Okay.  And now you mentioned here that in the

20        course of your business you carry sums of cash that

21        may exceed 7,000 or 10,000.  You didn't mention

22        that.  What is this carrying of cash about?

23   A    Sometimes I go to the supply house when I pay the

24        bill that's due for the month, and other times it's



```
 1            cash from buying or selling the precious metals.
 2      Q     And as you said earlier, you've never had an
 3            incident where there was any attempt to rob you
 4            during the transport of cash or precious metals.
 5      A     Correct.
 6      Q     Did your father ever have a carrying permit?
 7      A     At one point he did.  I believe so.
 8      Q     And he doesn't have it anymore?
 9      A     No.  He's a convicted felon now.
10      Q     Did he lose his license as a result of that felony
11            conviction, or was it before that?
12      A     I believe it was prior to that.
13      Q     You had mentioned earlier that one of the reasons
14            that you needed a concealed handgun is because of
15            self-defense.
16      A     Correct.
17      Q     And that you, if you're attacked, because of your
18            injuries you're unable to defend yourself.
19      A     Correct.
20      Q     So what does that mean?  If somebody comes to punch
21            you, you're going to shoot them?  Is that your
22            intention?
23                       MR. CONNORS:  Objection.
24      A     I can't say.  I would like to be prepared.
```

```
 1    Q   But it's deadly force.  I mean you could get killed
 2        with a knife or with a bat, but it's not
 3        necessarily the same type of weapon.
 4    A   Yes.
 5    Q   But you will agree with me, though, that if you're
 6        in a pushing type of altercation with somebody, and
 7        you feel that you're unable to respond because you
 8        may reinjure yourself, that it would not be
 9        appropriate to shoot the guy with your concealed
10        handgun.
11                    MR. CONNORS:  Objection.
12    A   Correct.
13    Q   All right.  Do you have any other physical
14        limitations because of these injuries you described
15        to your leg and to your chest?
16    A   No.  That's it.
17    Q   What's the injury to your chest again?
18    A   It's the sternal clavicular joint where your
19        collarbone connects to your sternum.
20    Q   And you broke it?
21    A   The whole joint exploded.
22    Q   So what did they do?  They rebuilt it?
23    A   Yes.  They had to reconstruct the whole joint.  And
24        I saw my doctor last week, and he just cleared me
```

```
 1          to start doing extremely light weights up top to
 2          get my muscles moving again.
 3     Q    So my next question is what physical limitations do
 4          you have as a result of that chest injury?
 5     A    Basically I only have use of one arm.
 6     Q    Which arm?
 7     A    My right arm.  I can't hold any weight with my left
 8          arm.  I can't lift myself up with my left arm.  I
 9          can't hold any heavy weights above me.  I can't use
10          any forward force.
11     Q    Does it limit you at work?
12     A    Yes.
13     Q    How does it limit you at work?
14     A    Pulling wires.  Um, just day-to-day activity and
15          usage of my arms.
16     Q    And the doctor says that you're going to be able to
17          start using more weight?
18     A    He just gave me clearance to start actually moving
19          the weights and getting my muscles moving again.
20     Q    And this accident, there were two separate --
21     A    Yes.  Two separate accidents, three surgeries.
22     Q    Okay.  And has the doctor given you a diagnosis of
23          any type of permanency or anything like that?
24     A    Arthritis is permanent, and it's actually already
```

```
 1        started to set in.

 2   Q    Is that in the leg?

 3   A    Both.  I have limited mobility in my leg.  My range

 4        of motion is not the same as my other leg.  Um,

 5        it's obviously going to be a weaker point due to

 6        the injury compared to my other leg.  And as far as

 7        this goes, um, I actually cannot take any hits to

 8        the chest as one of the pins in my chest may poke

 9        one of my vital organs.

10   Q    You have pins in your chest?

11   A    Yes.

12   Q    Are they permanent?

13   A    Yes.

14   Q    What is the name of the doctor that is treating you

15        or who performed the surgery?

16   A    His name is Dr. Luke Oh.

17   Q    Where is he located?

18   A    Mass. General Hospital.

19   Q    And that's in Boston.

20   A    Yes.

21   Q    Is he the same doctor for your leg?.

22   A    Yes.

23   Q    What's the injury to the leg again?

24   A    It is a tibia/fibular fracture with an ACL, PCL,
```

```
 1              and LCL tear with a meniscus tear.

 2   Q    And has the physician given you any type of

 3        diagnosis to you as to permanency on that?

 4   A    Um, range of motion and arthritis.

 5   Q    All right.  And you said you can't take a what?

 6   A    I can't take a solid blow to my chest.

 7   Q    Why would you take a solid blow to your chest?

 8   A    If anyone tried to attack me.  If I crashed on a

 9        motorcycle again.  Any type of blunt force trauma

10        to my chest.

11   Q    Okay.  So as a result of that warning, you believe

12        you need a handgun permit?

13                   MR. CONNORS:  Objection.

14   A    Yes.

15   Q    So if somebody is going to punch you in the chest

16        you're going to shoot them.  Is that your intent?

17                   MR. CONNORS:  Objection.

18   A    I don't know.

19   Q    Do you believe that the police chief, um,

20        arbitrarily denied your application?

21   A    Yes.

22   Q    And what basis do you have for that?

23   A    First off, how long he took to respond.  Which

24        Mass. only mandates 45 days to render a decision,
```

```
 1          he took about 120.  He based his denial on a
 2          fabricated lie.
 3     Q    What was that?
 4     A    An alleged incident that supposedly occurred in
 5          2011.  And the fact that he told me to my face that
 6          my father will be involved.
 7     Q    Now, do you have any evidence to believe that the
 8          Town of Chatham, or the police chief, or the police
 9          department, have a practice of denying other people
10          their carrying permit --
11                    MR. CONNORS:  Objection.
12     A    I don't know.
13     Q    -- for unlawful reasons?
14     A    I don't know.
15     Q    Have you ever heard any rumor that it's difficult
16          do get a license do carry in Chatham?
17     A    I have never heard of anybody being denied in
18          Chatham personally.
19     Q    Okay.  Has your father -- he's not reapplied for a
20          license.
21     A    No.
22     Q    Does he have an FID card?
23     A    No.
24     Q    Does he own any guns?
```

79

```
 1    A    No.

 2    Q    Did he own any guns at the time he had a license?

 3    A    I don't know.

 4    Q    So other than your description that you need the

 5         permit to carry a concealed handgun because of the

 6         carrying of the precious metals, the cash, fear of

 7         assault, of burglary, are there any other specific

 8         reasons that you feel that you need one?

 9    A    And my physical handicap.

10    Q    Right.  Any others?

11    A    No.  That's it.

12    Q    What are your career plans?

13    A    Um, I'm in the process of actually acquiring my

14         private pilot's license at the Chatham Airport,

15         which I start lessons next week.  So I'm trying to

16         determine where I want to go with that.  Whether I

17         want to go get my instrument rating and commercial

18         license to fly commercially, or just fly for sport

19         and fun.  As far as the career goes, it's up in the

20         air.  I'm not really sure right now.

21                   I'm working for my father's company.

22         He would like to hand the company down to me.  But

23         that would require me going to four years of

24         electrical school to become an electrical master to
```