EXHIBIT "8"

1

*ORIGINAL*

UNITED STATES DISTRICT COURT

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - x

GARRETT W. LING,

              Plaintiff,

VS.                       C. A. NO. 12-CV-10460-JCB

TOWN OF CHATHAM, CHATHAM POLICE DEPARTMENT,
MARK R. PAWLINA, CHIEF,
              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - x


DEPOSITION OF MARK R. PAWLINA


Deposition of MARK R. PAWLINA, a Defendant, taken

on behalf of the Plaintiff, pursuant to Notice and

the Massachusetts Rules of Civil Procedure, before

Diane Kelly, a Notary Public, duly qualified within

and for the Commonwealth of Massachusetts, at the

Offices of James P. Connors, 3291 Main Street,

Barnstable, Massachusetts, on January 4, 2013,

commencing at 12:10 p.m.


DIANE KELLY
COURT REPORTING SERVICES
P.O. Box 147
CENTERVILLE, MA  02632

1    Q    And what is your occupation, please?

2    A    Chief of police in the Town of Chatham.

3    Q    How long have you been chief of police in

4  the Town of Chatham?

5    A    Approximately seven years.

6    Q    And prior to being chief of police in

7  Chatham, what was your occupation?

8    A    I was an assistant chief in Hartford,

9  Connecticut.

10   Q    And did you leave Hartford based on a

11 retirement?

12   A    Yes, I retired from the Hartford Police

13 Department and upon being hired by the Town of

14 Chatham.

15   Q    And how many years were you in Hartford?

16   A    A little over twenty-two years.

17   Q    And Hartford, Connecticut, what duties did

18 you have as assistant chief?

19   A    Numerous duties at various times; but,

20 basically, I was a member of the command staff of the

21 police department overseeing a number of different

22 divisions within the department.

23   Q    Did your duties include anything regarding

24 firearms and firearms licensing?

1       A    At one point, they did, yes.

2       Q    And could you describe at that one point

3    what that is.

4       A    The process in which firearm licenses were

5    applied for was under my purview.

6       Q    And that process, would that include the

7    taking of applications for firearms licensing?

8       A    That would include that, yes.

9       Q    Would firearms licensing include what we

10   commonly know in Massachusetts a license to carry?

11      A    Yes.  The Connecticut law, of course, is a

12   bit different than Massachusetts, but I would answer

13   that yes.

14      Q    And in your twenty-two odd years in

15   Hartford, in particular, your duties processing

16   applications for firearms, did you receive any

17   specialized education?

18      A    Training, in terms of firearms laws, yes.  I

19   don't know if that would be considered "specialized

20   education," but it was training in terms of firearms

21   laws.

22      Q    And could you describe briefly what you mean

23   by "firearms laws."

24      A    Basically, just laws that pertain to

1    firearms in the State of Connecticut.

2        Q    And you've been an officer here for seven

3    years, and did you enter the Town of Chatham Police

4    Department as the chief of police?

5        A    Yes, I did.

6        Q    And when you were given the description of

7    your job, did they also describe -- "they" meaning

8    the people within the town, describe to you some of

9    your duties, what that would include, firearms

10   licensing?

11       A    Not specifically firearms licensing; but,

12   certainly, my job would include all operations of the

13   police department, and under that umbrella, that

14   would include firearms application and process.

15       Q    Over the course of the last seven years,

16   have you received any specialized training or

17   education regarding firearms licensing?

18       A    Yes.

19       Q    And could you describe what type of training

20   or education you have had, received.

21       A    I had attended what was called something to

22   the effect of new chiefs training in Massachusetts

23   put on by an attorney who specializes in police

24   training here in the State, and I attended that

11

1   training, which did include firearms, firearms law.

2       Q    Did the training include the standards for

3   issuances of various firearms licenses, describing,

4   for your benefit, firearms identification cards or

5   alternatively, a license to carry?

6       A    Yes.

7       Q    And did this education and training make any

8   distinction between the issuance of a FID card and a

9   license to carry?

10      A    I believe it did.  I don't remember those

11  exact details, what was covered in training in terms

12  of the way you presented the question, but there was

13  certainly discussion of FID cards and license to

14  carry.

15      Q    And in your personal experience as chief of

16  police, have you had the opportunity to become

17  familiar with the distinctions between a firearms

18  identification card and a license to carry?

19      A    Yes.

20      Q    And with those distinctions, does that

21  include standards for the issuance of each?

22      A    Yes, it would.

23      Q    And could you explain the difference between

24  the standard of an FID issuance and license to carry

1   issuance.

2       A    No, I don't think that I could explain it in

3   a really expert or -- in an expert fashion without

4   the (indicating) guidelines in front of me.

5       Q    And what are those guidelines?

6       A    The guidelines would be the laws that govern

7   firearms within the Commonwealth.

8       Q    And with those guidelines, is that what you

9   use when you receive an application for an FID card

10  or license to carry?

11      A    Yes.

12      Q    Could you identify the source of those

13  guidelines.

14      A    Again, I don't have that packet of

15  information right in front of me.  I'm sure that

16  information could be obtained pretty easily, but I

17  just don't have that in front of me.

18      Q    And when you receive an application, you go

19  ahead and review the application and then consult the

20  guidelines to make a determination regarding

21  issuance?

22      A    Yes.

23      Q    And is it your -- in your duties, duties as

24  chief of police, is it you that are required to issue

1    licenses to carry in the Town of Chatham?

2         A    Yes.

3         Q    And as part of the application process, do

4    you meet with the individual applicant?

5         A    Sometimes, yes.

6         Q    Is it required under town law or State law

7    to hold an interview with an applicant?

8         A    No, not "required."

9         Q    Do you recall at any point holding an

10   interview with a Garrett Ling?

11        A    Yes, I do.

12        Q    And do you recall when that interview was?

13        A    When it was?

14        Q    When it was.

15        A    I don't recall exactly.

16        Q    And do you recall at any point reviewing

17   Garrett Ling's application for a license to carry?

18        A    I'm sorry.  Could you repeat that?

19        Q    Yes.

20             Do you recall at any point reviewing

21   Garrett Ling's license to carry?

22        A    Yes.

23        Q    Do you at any point recall reviewing his

24   application for a firearms identification card?

1     A.   Yes.

2     Q    And do you know when his firearms

3     identification card was issued?

4     A    I don't recall.

5     Q    Do you know how old you have to be to obtain

6     a firearms identification card?

7     A    I believe it's twenty-one.

8     Q    And how old do you have to be to obtain a

9     license to carry?

10    A    I believe it's twenty-one.

11    Q    And this process, is there any statutory

12    guidelines on how to, for lack of a better word,

13    process an application for a license to carry?

14    A    Yes, there are statutory guidelines.

15    Q    And are there general laws in Massachusetts

16    that you, as a licensing issuer, are required to

17    follow?

18    A    Yes.

19    Q    Do you recall what statute that may be?

20    A    I don't know the exact number of the

21    statute.

22    Q    I'm going to go a little out of turn here.

23    I just want to direct your attention to what's been

24    identified and pre-marked as an exhibit (handing).

15

1        A      (Witness referring to documents).

2        Q      Now, are you familiar with Exhibit 7 and

3     what it purports to be, which is a general law for

4     Massachusetts?

5        A      Well, not -- I'm not familiar specifically

6     with (indicating) this exhibit.  I haven't read it or

7     looked at it --

8        Q      I would like for you to familiarize yourself

9     with this document identified as Exhibit 7, and

10    particularly, the General Law 146 -- 1'm sorry, 140,

11    Section 131.

12       A      Okay.

13       Q      Please, take your time to review it,

14    understand what it is.  And you are under no time

15    constraint to review it.

16       A      (Witness referring to documents).

17       Q      Are you sufficiently familiar with that

18    document?

19       A      Fairly familiar with it.

20              MR.  LOUISON:  No, just -- go ahead.

21    I may have an objection, but I can't anticipate.

22    BY MR. CONNORS:

23       Q      Okay.  The reading of that language, is that

24    the statute that you utilize for the issuance of a

1    license to carry?

2        A    I believe it is.

3        Q    And you are required, under law, to follow

4    the statutory language for the issuance of a license

5    to carry?

6        A    Yes, it is.

7        Q    And going back to Mr. Ling, I want to have

8    you look at Exhibit 3 (handing).

9        A    (Witness referring to documents).

10        Q    And I would direct your attention to

11    Exhibit 3 (indicating).  And, once again, take your

12    time to familiarize yourself with that exhibit.

13              MR.  LOUISON:  Those are his answers

14    to interrogatories or --

15              MR. CONNORS:  That's the petition.

16              THE WITNESS:  (Witness referring to

17    documents).

18    BY MR. CONNORS:

19        Q    Are you familiar with this particular

20    document?

21        A    Not really.

22        Q    Have you ever seen it before?

23        A    I don't recall if I have or not.

24        Q    For the record, Exhibit 3 is identified as

1        Q     And under that statute, there's other
2     outlined disqualifiers, as well; isn't that true?
3        A     (No response).
4        Q     Such as mental health and the like?
5        A     Yes.
6        Q     And as a part of your review of Mr. Ling,
7     did you make an inquiry as to whether he had suffered
8     any mental health commitments or confinements?
9        A     Based upon his application, there was
10    nothing to indicate that.
11       Q     And upon receipt of that application, you
12    took it to be true then?
13       A     Yes.
14       Q     And you didn't do any further following up,
15    inquiry, as to whether he had been confined to a
16    mental institution?
17       A     I did not personally, no.
18       Q     And did you run a report on a national level
19    to determine if he had been convicted of any crimes
20    in another jurisdiction?
21       A     I did not.
22       Q     Do you know if anybody, particularly
23    Sergeant Goddard, had done that after receiving this
24    application?

32

1      A    Around that time, yes.

2      Q    And you went ahead and didn't make a

3   decision until December 23rd of 2011; isn't that

4   correct?

5      A    Actually, that's not correct.

6      Q    Okay.  When did you indicate formally to

7   Mr. Ling that his application for license to carry

8   was being denied?

9      A    The decision was made within the forty days;

10  however, I do acknowledge that the letter did not go

11  out to him until December 23rd.

12     Q    And you indicate that -- indicated that the

13  decision was made within the forty days; but, you did

14  not notify Mr. Ling in accordance with Chapter --

15  with GL 140, Section 131 within the forty days; did

16  you?

17     A    Yes, that's correct.

18              The reason for that was because

19  Mr. Ling wanted to -- wanted to meet with me and

20  discuss the application, and we did meet and discuss

21  it; however, in setting up the meeting, I don't

22  recall why, it seemed to take quite a period of time

23  to get a date set up between us.

24     Q    And do you recall when you met him?

1   familiar with this particular page (indicating) of

2   this edition?

3        A    Yes.

4        Q    And after the Massachusetts legislature

5   decriminalized marijuana, is there anything that the

6   Commonwealth had indicated to the chiefs of police

7   regarding marijuana and the issuances of a license to

8   carry?

9        A    I'm sorry, can -- could you repeat that?

10       Q    After decriminalization of marijuana, did

11  the Massachusetts legislature render a legal opinion

12  regarding decriminalized marijuana being utilized as

13  a -- as part of an analysis for a person's

14  application for a license to carry?

15       A    I don't know if the legislature produced

16  something for police chiefs.  That would be very

17  rare.  It may have come through another form.

18       Q    And this particular law enforcement guide,

19  do you utilize it on a regular basis in the Chatham

20  Police Department?

21       A    We certainly use it as a reference.

22       Q    And I would like to direct your attention to

23  paragraph three of this particular document.  Please

24  review it, sir.

```
1        A      (Witness referring to documents).
2                    MR. LOUISON:   What page is that?
3                    MR. CONNORS:   Page 215, same document,
4    paragraph three.
5                    THE WITNESS:   That's paragraph number
6    three?
7    BY MR. CONNORS:
8        Q    Yes, number three.  I would like for you to
9    review that.
10       A      (Witness referring to documents).
11       Q    You denied Mr. Ling his license to carry
12   based on suitability; isn't that correct?
13       A    Yes.
14       Q    And part of your analysis for his
15   determination of being unsuitable was, as you
16   indicate in your letter, that he had admitted smoking
17   illegal drugs; to wit, marijuana; isn't that correct?
18       A    Yes.
19       Q    And do you know if he received a single
20   citation for that alleged transgression?
21       A    I believe that he did.
22       Q    And you utilized that, in part, to determine
23   that Mr. Ling was unsuitable; isn't that correct?
24       A    In part, yes.
```

42

1        Q     And isn't it true that, pursuant to this

2    guide and statutory law, that you, as the issuer of a

3    license to carry, are not to consider the use of

4    small quantities of marijuana as a penalty or

5    sanction or to be determined or utilized based on

6    suitability of an applicant for a license to carry?

7               MR. LOUISON:  Objection.

8               THE WITNESS:  (No response).

9    BY MR. CONNORS:

10       Q     Isn't that correct?

11       A     No, that's not correct.

12       Q     You're indicating this afternoon that you

13   can utilize a civil infraction of marijuana use, less

14   than an ounce, for your determination of suitability?

15       A     Could you repeat that again.

16       Q     Sure.  Mr. Ling is charged with a possession

17   of marijuana, small quantity, civil infraction,

18   hundred dollar fine; are you indicating today that

19   you can utilize that civil infraction as a basis for

20   his -- for his -- denying -- your denying a license

21   to carry?

22               MR. LOUISON:  Objection.

23               THE WITNESS:  No, I'm not indicating

24   that.

54

1       A      Based on this report here, I don't think

2   anyone was charged at that time, based upon what I

3   see here.

4       Q      Turning to the next police report, there was

5   an incident at a place called Fishermen's access, off

6   Queen Anne Road?

7       A      Yes.

8       Q      And this report indicates that a bottle of

9   alcohol was found in a vehicle; isn't that correct?

10      A      Yes, according to the report, a bottle of

11  hard alcohol was located in the vehicle.

12      Q      And was that Garrett Ling's vehicle?

13      A      I don't know whose vehicle it was.  (Witness

14  referring to documents).

15      Q      Was the vehicle identified as

16  Garrett Ling's?

17      A      (Witness referring to documents).

18      Q      If I (indicating) may --

19      A      Well, I'm looking through here.

20      Q      I'm sorry.

21      A      It does not appear --

22             THE COURT REPORTER:  "Does not

23  appear" --

24             THE WITNESS:  Does not appear that the

55

1    vehicle belonged to Mr. Ling.

2    BY MR. CONNORS:

3        Q    In fact, it indicates that it may have been

4    a vehicle with an address of 18 Sounding lane;

5    doesn't it?

6        A    Yes.

7        Q    Mr. Ling lives at 57 Winter Home Road in

8    Chatham; is that correct?

9        A    Yes.

10       Q    Is it fair to say that this wasn't

11   Mr. Ling's vehicle?

12       A    Yes.

13       Q    And yet that served as a basis for denial of

14   his license to carry?

15       A    What did?

16       Q    This (indicating) incident, of alcohol --

17       A    The incident did, yes.

18       Q    -- the alcohol in an automobile?

19       A    Yes, his presence at the party, that there

20   was alcohol.  Did contribute to it.

21       Q    And at that point, did you call Mr. Ling in

22   to discuss the maintaining of his license -- strike

23   that.

24                 Did you call Mr. Ling in to discuss

62

1    correct?

2         A    (Witness referring to documents).

3         Q    Paragraph -- interrogatory five.

4         A    (Witness referring to documents).  I noted

5    it.

6                   As the interrogatory says -- I'll

7    quote it -- "nor did he have the proper purpose for

8    such a permit."

9                   But, that doesn't really direct --

10                  THE COURT REPORTER:  "Really direct"?

11                  THE WITNESS:  He -- that doesn't

12   relate directly to his suitability.

13   BY MR. CONNORS:

14        Q    Has there been any incidents regarding or

15   involving a firearm and Mr. Ling to your knowledge?

16        A    I'm sorry?  Could your repeat that?

17        Q    I'm sorry.  Have there been any incidents

18   regarding the use of a firearm and that have been --

19   have been called to your attention with Mr. Ling?

20        A    In terms of any problem or issue with him

21   using a firearm?  No, nothing has been called to my

22   attention.

23        Q    Misusing, improperly storing, shooting in a

24   safety zone, has that ever been called to your

54

1        A    Based on this report here, I don't think

2    anyone was charged at that time, based upon what I

3    see here.

4        Q    Turning to the next police report, there was

5    an incident at a place called Fishermen's access, off

6    Queen Anne Road?

7        A    Yes.

8        Q    And this report indicates that a bottle of

9    alcohol was found in a vehicle; isn't that correct?

10       A    Yes, according to the report, a bottle of

11   hard alcohol was located in the vehicle.

12       Q    And was that Garrett Ling's vehicle?

13       A    I don't know whose vehicle it was.  (Witness

14   referring to documents).

15       Q    Was the vehicle identified as

16   Garrett Ling's?

17       A    (Witness referring to documents).

18       Q    If I (indicating) may --

19       A    Well, I'm looking through here.

20       Q    I'm sorry.

21       A    It does not appear --

22                  THE COURT REPORTER:  "Does not

23   appear" --

24                  THE WITNESS:  Does not appear that the

55

1    vehicle belonged to Mr. Ling.

2    BY MR. CONNORS:

3        Q    In fact, it indicates that it may have been

4    a vehicle with an address of 18 Sounding lane;

5    doesn't it?

6        A    Yes.

7        Q    Mr. Ling lives at 57 Winter Home Road in

8    Chatham; is that correct?

9        A    Yes.

10       Q    Is it fair to say that this wasn't

11   Mr. Ling's vehicle?

12       A    Yes.

13       Q    And yet that served as a basis for denial of

14   his license to carry?

15       A    What did?

16       Q    This (indicating) incident, of alcohol --

17       A    The incident did, yes.

18       Q    -- the alcohol in an automobile?

19       A    Yes, his presence at the party, that there

20   was alcohol.  Did contribute to it.

21       Q    And at that point, did you call Mr. Ling in

22   to discuss the maintaining of his license -- strike

23   that.

24                Did you call Mr. Ling in to discuss

1          Q     Did he at any point list in his application

2     or describe to you the phrase -- or purpose as, all

3     lawful purposes?

4          A     I don't recall him making any -- using any

5     phrase like that.

6          Q     Are you, as chief of police, entitled to

7     determine, as a basis for issuance of a license to

8     carry, the purpose of the issuance of the license to

9     carry?

10         A     I didn't use purpose for the license to

11    carry.  It just -- I just note (indicating) it

12    because it did come up in our discussion.

13                    And in our meeting, because I did ask

14    him what the purpose was, and he was -- as I said, he

15    was very vague, unclear, in terms of what his purpose

16    was for wanting the permit, what it was.

17         Q     Is he required, under law, to state a

18    purpose to you for an application for a license to

19    carry?

20         A     He's not "required" to state a purpose, but

21    I did not use "purpose" as a reason for denial.

22         Q     Yet, you have indicated in your

23    interrogatories that part of the basis was that he

24    did not have satisfactory purpose; isn't that

62

1    correct?

2         A    (Witness referring to documents).

3         Q    Paragraph -- interrogatory five.

4         A    (Witness referring to documents).  I noted

5    it.

6              As the interrogatory says -- I'll

7    quote it -- "nor did he have the proper purpose for

8    such a permit."

9              But, that doesn't really direct --

10             THE COURT REPORTER:  "Really direct"?

11             THE WITNESS:  He -- that doesn't

12   relate directly to his suitability.

13   BY MR. CONNORS:

14        Q    Has there been any incidents regarding or

15   involving a firearm and Mr. Ling to your knowledge?

16        A    I'm sorry?  Could your repeat that?

17        Q    I'm sorry.  Have there been any incidents

18   regarding the use of a firearm and that have been --

19   have been called to your attention with Mr. Ling?

20        A    In terms of any problem or issue with him

21   using a firearm?  No, nothing has been called to my

22   attention.

23        Q    Misusing, improperly storing, shooting in a

24   safety zone, has that ever been called to your

68

1   check, and that's the big one.

2       Q    So, basically, as we've been discussing, the

3   issue of the chief's discretion based upon a person's

4   suitability and a person's proper purpose, those are

5   not considerations in the issuance of an FID card?

6       A    No, not -- not in the way it is for a

7   license to carry, no.

8       Q    And is it fair to say, as long as someone

9   does not have a disqualifying conviction, an FID card

10  is issued?

11      A    Yes.

12      Q    On a personal note, do you consider the

13  issuance of an FID card and license to carry

14  different in terms of importance in the seriousness

15  of granting it?

16      A    Yes.

17      Q    And what is that?

18      A    Yes, yes, they're very different, in the

19  sense that the license to carry, in my mind, deserves

20  much more scrutiny.

21              And, also, certainly, based on the

22  State statute, requires more scrutiny because that

23  person is now allowed to carry a concealed firearm

24  upon their person.